IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

|  |  |  |
|---|---|---|
| SECURITY BANK OF KANSAS CITY, | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | CIVIL ACTION |
| v. | ) ) | No. 06-CV-2364-CM |
| | ) | |
| OSCAR SMITH, JACK RYAN, UNIQUE CO-OPERATIVE SOLUTIONS, INC., and UNITED STATES OF AMERICA, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM AND ORDER

Security Bank of Kansas City ("Security Bank") filed this interpleader suit regarding $115,000 on deposit with Security Bank. Originally, the United States ("United States"), Unique Co-Operative Solutions, Inc. ("UCSI"), Oscar Smith ("Smith"), and Jack Ryan ("Ryan") claimed an interest in the funds. Security Bank, Smith and UCSI disclaimed any interest in the funds and were dismissed from this lawsuit. The United States and Ryan are the only remaining claimants. This court held a bench trial on August 27, 2008. The parties completed post-trial briefing, and the court has reviewed the briefs the parties submitted. The court is now prepared to issue its findings of fact and conclusions of law in accordance with Fed. R. Civ. P. 52(a). For the reasons set forth below, the court concludes that Ryan is entitled to recover the funds.

### Findings of Fact

### Smith and Ryan

1. In 1999, Ryan began working for a division of Boundless Corporation ("Boundless"), Boundless Manufacturing Services, as Vice President of Supply Chain Management. He has also been on the Board of Directors of Boundless ("Board") and served as acting Chief Executive Officer.

2. Smith was a major stockholder in Boundless.

3. In late 2001 or early 2002, Ryan and Smith became acquainted through their association with Boundless.

**Security Bank Loan**

4. On or about August 21, 2000, Security Bank made a $6 million loan to UCSI ("Bank Loan"), which is secured by a perfected security interest in all of UCSI's assets.

5. Smith personally guaranteed repayment of the Bank Loan by one or more guaranty agreements, including a June 28, 1999 guaranty from Smith to the Bank ("Guaranty").

6. Security Bank asserts that the Guaranty is secured by all of Smith's stock in Vision Technologies.

**2004**

7. In March 2003, Boundless filed for Chapter 11 bankruptcy.

8. In the summer of 2004, UCSI owed Security Bank approximately $4 million and had incurred tax liabilities.

9. That same summer, Smith, on behalf of UCSI, requested Security Bank to loan UCSI additional funds to enable UCSI to purchase products for its business operations.

10. Security Bank refused to make further advances to UCSI for various reasons, including UCSI's delinquent taxes—which were approximately $100,000 to $115,000.

11. UCSI had business that was waiting to be done but needed funding before it could complete the business. Both Security Bank and Ryan knew that funding was needed to complete the pending business.

12. Smith, Security Bank, and Ryan knew that funds needed to be forwarded to a supplier—VXL—by August 20, 2004.

13. On August 18, 2004, Smith approached Ryan and requested to borrow $115,000.

14. Ryan believed that the $115,000 would allow Smith to get funds to do the pending business.

15. Ryan did not want to loan the money to Smith but was interested in acquiring Boundless stock.

   Ryan offered to purchase 25% of Boundless stock in exchange for $115,000.

16. Smith rejected Ryan's offer.

17. On August 19, 2004 at 5:03 p.m., Ryan made the following offer to Smith via email:

> Oscar,
> I agree that you have put in a lot of time energy and money into the success of Vision Technologies and it should be worth something. You are asking me to take a very large risk with very little notification and no due diligence. My understanding is that the Vision stock is pledged against the UCSI debt and will not be released until the bank is paid. I am told the debt is substantial.
>
> So if BND does not confirm I lose the money and if UCSI does not meet the terms of their agreement with the bank I lose the money. That said, I'm still willing to compromise.
>
> 1. I'll drop the number to 20%.
> 2. When the Itona rolls out and we need another buyer/planner Mark is allowed to rejoin the company in his original position. This date will be at confirmation or sooner.
>
> 3. I represent the Boundless management on the BOD post confirmation.
>
> My attorney informed me that he can wire money ifwe [sic] have the details early enough tomorrow. I need written confirmation from the bank that all funds for the VXL product will be released on receipt of the cash and there will be no more delays. If everything is agreed upon I will send a short document outlining the agreement for review and signature.
>
> Jack

18. Mark is Ryan's brother.

19. Smith responded to Ryan with the following email:

> Jack, as long as you understand the bank gets paid off it's [sic] debt first, prior to any stock being released (the stock has been pledged to the bank and must be released from the bank before it can be distributed to you[)], please wire the money. This should remain confidential between you and me, until such time it can be released to other parties. It is my understanding you will have the money wired asap this morning. Since this money is coming from your trust, please

>   provide confirmation on the wire asap, so the bank can release funds for the ITONA.
>
>   Information please wire the money to: Amount to be wire, $115,000.00
>
>   Security Bank of Kansas City, Kansas
>   Bank Routing number 101000925
>   Attn: Jim Lewis
>   Deposit in: Unique Co-Operative Solutions, Inc.
>   Checking account 116002655

20. Ryan responded on August 20, 2004 at 7:56 a.m.:

>   Oscar,
>   1. I do not have a problem with the stock being pledged.  The stock has no value unless we make this whole thing work.  We will need to discuss the plan and schedule to pay off the bank at some point in time.  We also need to draw up an agreement that covers the terms of this deal.
>
>   2. Just so you know - I had discussions with Frank and Joe G. yesterday about my looking into a deal with you.  Frank indicated that he would be interested in taking some of the investment if the terms are right.  I will need to complete my discussion with Frank (since I have already made the offer) but will not discuss the terms with JG.
>   J.R.

21. On August 20, 2004, Smith and Ryan were trying to work out how the stock could be put in Ryan's name so that he would have the voting rights associated with the stock, in light of the fact that the stock was pledged to Security Bank.

22. That same day, Smith requested that Ryan send a fax of the proposed terms to Jim Lewis, the president of Security Bank.  Ryan faxed the August 19, 2004 email to Jim Lewis at Security Bank so Security Bank would know what Ryan and Smith were proposing to do.

23. On August 20, 2004, Ryan instructed his attorney to transmit $115,000 to Security Bank.

24. Smith and Ryan had not signed a written agreement when Ryan transferred the funds.

25. After the funds were transferred, Ryan and Smith continued to discuss the terms of the agreement.

26. On October 4, 2004, Ryan sent Smith a written agreement outlining the terms he and Smith had agreed to in August 2004.

27. Smith refused to sign the written agreement for a variety of reasons, including (1) he had hired an attorney to "take care of" the deal with Ryan; (2) he did not want to sign it without counsel—although he had counsel; (3) he would not sign it because he had counsel—and his counsel did not specifically say, "that's what you should do, Oscar"; and (4) he was not going to sign any agreement that contradicted his commitment to Security Bank, but he later admitted that the agreement did not contradict his commitment to Security Bank.  Eventually, he testified that he did not sign the agreement because he thought they had an agreement that Ryan would get the 20% of stock after Smith paid off Security Bank.  But he then testified he would not sign a written agreement memorializing the agreement that Ryan would get the 20% of stock after Smith paid off Security Bank because he thought that Security Bank and his attorney would have to agree to it.

28. Ryan hired an attorney because he believed he and Smith had not reached an agreement.

29. Despite continued negotiation, the parties never signed a written agreement.

30. Ryan's brother was rehired but it is unclear when and whether he was hired because of Ryan and Smith's August 2004 negotiations.  Likewise, Ryan was put on the Board, but the record is unclear whether this was pursuant to the August 2004 negotiations.  When questioned about these events, Smith testified, "Anything Jack asked for was done."  Ryan never received the stock or the voting rights associated with the stock.

## Conclusions of Law

### Federal Tax Lien

1. A federal tax lien attaches to all property and rights to property that belong to the taxpayer at the time of assessment.  *United States v. Cache Valley Bank*, 866 F.2d 1242, 1244 (10th Cir. 1989).

2. A federal tax lien cannot extend beyond the property interest held by the delinquent taxpayer. *Gardner v. United States*, 34 F.3d 985, 987 (10th Cir. 1994). "Consequently, a federal tax lien attaches only to the property interests of the delinquent taxpayer at the time of assessment." *Id*.

3. Under the Federal Revenue Act, state law determines the nature of a taxpayer's legal interest in the property. *Cache Valley Bank*, 866 F.2d at 1244.

4. On August 20, 2004, UCSI owed the IRS approximately $100,000 to $115,000. Thus, if Ryan transferred the $115,000 to UCSI pursuant to a valid, binding contract with Smith, the funds belonged to UCSI and the federal tax lien attached to the funds when they were deposited with Security Bank.

### Contract

5. "In order for parties to form a binding contract, there must be a meeting of the minds as to all essential terms." *Augusta Bank & Trust v. Broomfield*, 643 P.2d 100, 106 (Kan. 1982). The controlling question as to whether a binding contract was entered into depends on the intention of the parties and is a question of fact. *Id*. at 107–07. "In determining intent to form a contract, the test is objective, rather than subjective, meaning that the relevant inquiry is the 'manifestation of a party's intention, rather than the actual or real intention.'" *SW & Assocs., Inc. v. Steven Enters., LLC*, 88 P.3d 1246, 1249 (Kan. Ct. App. 2004) (citing 17A Am.Jur.2d, Contracts § 27). In other words, the focus is not whether the subjective minds of the parties have met, but whether the parties' outward expression of assent is sufficient to form a contract. *Id*. (citing 1 Lord, Williston on Contracts § 4:1, p. 241 (1990)).

6. "To constitute a meeting of the minds there must be a fair understanding between the parties which normally accompanies mutual consent and the evidence must show with reasonable

definiteness that the minds of the parties met upon the same matter and agreed upon the terms of the contract." *Steele v. Harrison*, 552 P.2d 957, 962 (Kan. 1976).

7. "One method by which the intention to contract may be demonstrated is by the process of offer and acceptance." *Prince Enters., Inc. v. Griffith Oil Co.*, 664 P.2d 877, 882 (Kan. Ct. App. 1983). "Any expression of assent that changes the terms of the offer in any material respect may be operative as a counter-offer, but it is not an acceptance and constitutes no contract." *Steele*, 552 P.2d at 962.

8. Ryan argues that there was no meeting of the minds because he and Smith intended to continue negotiating the terms of the contract after he transferred the money on August 20, 2004 and that the parties intended to complete a formal written contract.  The United States argues that Ryan's performance—wiring the $115,000—evidences that he and Smith reached an agreement in August 2004 that in exchange for Ryan's payment of $115,000, Smith intended to transfer 20% of his Boundless stock to Ryan once the Bank Loan was paid off.

9. Under Kansas law, "the mere intention to reduce an informal agreement to a formal writing is not of itself sufficient to show that the parties intended that until the formal writing was executed the informal agreement should be without binding force." *King v. Wenger*, 549 P.2d 986, 989–90 (Kan. 1976).  "But where the intent of the parties is clear that they are negotiating with an understanding that the terms of the contract are not fully agreed upon and a written formal agreement is contemplated a binding contract does not come into existence in the absence of execution of the formal document." *Id*. at 990.  The fact that the parties contemplated a written, formal document is some, but not conclusive, evidence that they intended not to be bound until the written document is executed.  *Id*.  The court looks to the subsequent conduct and interpretation of

the parties themselves to determine whether the parties intended to be bound even though a written agreement was never signed. *Id*.

10. The United States relies on *Miles v. City of Wichita*, 267 P.2d 943 (Kan. 1954) for the proposition that (1) Ryan's performance evidences that there was an agreement on August 20, 2004 and (2) the August 20, 2004 e-mails constituted a written contract between Ryan and Smith. In *Miles*, a sand company orally agreed to lease land from a landowner. *Id*. at 946–47. The company moved its equipment onto the land and began pumping and delivering sand. *Id*. Before the contract was committed to writing, the city condemned the land but refused to pay the sand company, insisting that no oral contract existed between the company and the landowner. *Id*. The court held that an oral contract existed prior to the signing of the written agreement. *Id*. The court reasoned that both parties had begun performing the contract, and "[t]he preparation and execution of the written lease was but little more than a clerical act." *Id*.

11. On August 20, 2004, Ryan wired the money to Security Bank. Usually, this would suggest Ryan believed there was a binding contract. *See, e.g., King*, 549 P.2d at 990–91 (finding no binding agreement where the parties contemplated a formal, written agreement because neither party performed under the informal written agreement); *Miles*, 267 P.2d at 947 (holding an oral contract was binding where both parties began performance and later incorporated the terms into a written lease). But the circumstances in this case are distinguishable from *King* and *Miles*. Here, the overall time frame for the negotiations was very short for a six-figure business deal. The money had to be transferred on August 20, 2004 or UCSI would not get funds needed to fulfill its pending orders, in which case the entire deal would be moot and UCSI would be unable to meet its obligations. Smith did not approach Ryan about a loan until August 18, 2004, two days before the funds had to be transferred. Although Ryan was not interested in loaning Smith money, Ryan was

interested in purchasing Boundless stock from Smith.  On August 19 and 20, Ryan and Smith exchanged emails attempting to work out a deal.  Ryan's emails specifically contemplated a written agreement.  On August 20, Smith and Ryan were still trying to work out how the stock could be put in Ryan's name so that he would have the voting rights associated with the stock, in light of the fact that the stock was pledged to Security Bank.

12. Under these circumstances, it is reasonable to believe that Ryan transferred the funds with the understanding that he and Smith would finalize the negotiations and execute a written agreement after he transferred the funds to Security Bank.  Accordingly, the court finds that Ryan's performance was not conclusive evidence of an agreement.

13. Additionally, it is clear from the record that Ryan contemplated a written agreement.  In his August 19 and 20 emails, he said that there would be a written agreement covering the terms of the deal.  His behavior subsequent to transferring the money to Security Bank is consistent with his belief that he and Smith were going to formalize the agreement in writing.  On October 4, 2004, Ryan followed up with a written agreement outlining the terms he and Smith had discussed in August 2004.  Eventually, Ryan hired an attorney because he and Smith had not reached an agreement.

14. Whether Smith contemplated a written agreement is less clear, but based on the record—specifically Smith's testimony—the court finds that Smith's behavior also suggests the parties intended to continue negotiating the deal and execute a written contract.  Although Smith testified at trial that he believed he and Ryan had an agreement that Ryan would get 20% of his Boundless stock in exchange for the $115,000, his actions surrounding the deal are inconsistent with his testimony.  Smith refused to sign the October 4, 2004 written agreement, which memorialized the terms Smith and Ryan discussed in August 2004.  His testimony about why he did not sign the

October 2004 agreement is contradictory.  He testified that he refused to sign the agreement because (1) he had hired an attorney to "take care of" the deal with Ryan; (2) he did not want to sign it without counsel—although he had counsel; (3) he would not sign it because he had counsel—and his counsel did not specifically say, "That's what you should do, Oscar;" and (4) he was not going to sign any agreement that contradicted his commitment to Security Bank, but he later admitted that the agreement did not contradict his commitment to Security Bank.  Eventually, he testified that he did not sign the agreement because he thought they had an agreement that Ryan would get the 20% of stock after Smith paid off Security Bank.  But he then testified he would not sign a written agreement memorializing the agreement that Ryan would get the 20% of stock after Smith paid off Security Bank because he thought that Security Bank and his attorney would have to agree to it.

15. Also relevant is the rehiring of Ryan's brother and Ryan's position on the Board of Directors.  Smith testified, "Anything Jack asked for was done."  But these facts do not outweigh the evidence that the parties intended to continue negotiations.  The record does not say when either event happened or why.  Ryan's brother may have been rehired on his own merit, and not as part of an agreement.  Additionally, the record does not address whether Ryan was put on the Board of Directors because of the August 2004 negotiations or because he was a valuable employee—he had been the acting CEO at one time.

16. Based on the record before it, the court finds that Ryan and Smith did not reach a meeting of the minds as to all essential terms in August 2004.  The court further finds that they intended to finalize the terms after Ryan transferred the funds to Security Bank.  Thus, there is no binding contract between Ryan and Smith.

17. In reaching this conclusion, the court has weighed the evidence and the credibility of the testimony of the witnesses—observing the manner and consistency of the witnesses' testimony—and reviewed the applicable law.

**IT IS THEREFORE ORDERED** that judgment is entered for Ryan and against the United States.

Dated this <u>14th</u> day of January 2009, at Kansas City, Kansas.

<u>s/ Carlos Murguia</u>
**CARLOS MURGUIA**
**United States District Judge**